1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MICHAEL M. COTTRELL,

11            Plaintiff,                    No. 2:  09-cv-0824 JAM CKD P

12       vs.

13   M. WRIGHT, et al.,

14            Defendants.              ORDER, FINDINGS AND

15                                     RECOMMENDATIONS

16   _____/

17            Plaintiff is a state prisoner proceeding *pro se* with a civil rights action pursuant to

18   42 U.S.C. § 1983.  This action is proceeding on plaintiff's complaint filed in March 2009 which

19   specifically claims that defendants M. Wright, R. Haynes and D. Sisson used excessive force

20   against plaintiff in violation of the Eighth Amendment to the United States Constitution during

21   the course of a cell extraction occurring on September 17, 2008.  Presently pending before the

22   court are defendants' motion for summary judgment (see Dkt. No. 51.), plaintiff's motion to

23   compel (see Dkt. No. 59.) and plaintiff's motion to stay the motion for summary judgment.  (See

24   Dkt. No. 60.)  For the followings reasons, plaintiff's motion to compel and motion to stay the

25   motion for summary judgment will be denied and it is recommended that defendants' motion for

26   summary judgment be granted.

1

I.  MOTION TO COMPEL & MOTION TO STAY MOTION FOR SUMMARY JUDGMENT

A discovery and scheduling order was set in this case in February 2011 after defendants filed their answer.  The parties were given until June 10, 2011 to conduct discovery and to file any necessary motions to compel by that date.  All pretrial motions (except motions to compel discovery which were due by June 10, 2011) were due by September 2, 2011.  (See Dkt. No. 35.)

On June 2, 2011, plaintiff filed a "motion for extension of time to conduct discovery; receive the response to interrogatories as well as response from defendants to produce documents."  (See Dkt. No. 40.)  On August 8, 2011, the undersigned construed the June 2, 2011 motion as a motion to compel and the motion was granted.  (See Dkt. No. 45.)  Defendants were then given thirty days to serve their answers to plaintiff's discovery requests.  The scheduling order was also amended giving the parties until October 21, 2011 to file all pretrial motions. (See id.)  Defendants then sought and received an extension of time to complete and serve their discovery responses until September 19, 2011.  (See Dkt. Nos. 46 & 47.)

Defendants then received an extension of time to file a dispositive motion until November 4, 2011.  (See Dkt. Nos. 49 & 50.)  Thereafter, defendants filed their motion for summary judgment on November 4, 2011.  Plaintiff requested an extension of time to file a response to the motion to summary judgment.  (See Dkt. No. 53.)  Plaintiff's request was granted and he was given until January 18, 2012 to file an opposition to the motion for summary judgment.  (See Dkt. No. 54.)  After no opposition was filed by that date, plaintiff was ordered to file an opposition within thirty days of January 31, 2012.  (See Dkt. No. 56.)  Subsequently, in March 2012, plaintiff filed his opposition to defendants' motion for summary judgment. Defendants filed a reply to plaintiff's opposition on March 19, 2012.

On April 13, 2012, plaintiff's motion to compel and motion to stay the summary judgment motion were entered on the docket.  (See Dkt. Nos. 59 & 60.)  Each document had a certificate of service of January 1, 2012 and January 19, 2012 respectively.  (See Dkt. No. 59 at

2

1  p. 20 & Dkt. No. 60 at p. 4.)  Pursuant to the prisoner mailbox rule, these documents are deemed

2  to have been filed on January 1, 2012 and January 19, 2012 respectively.  See Houston v. Lack,

3  487 U.S. 266, 276 (1988).  Defendants filed oppositions to the motion to compel and the motion

4  to stay the motion for summary judgment.  (See Dkt. No. 61.)

5          As the procedural history indicates, the discovery deadline for filing a motion to

6  compel had long since expired even after applying the requisite prisoner mailbox rule to

7  plaintiff's motion to compel.  The initial deadline of June 10, 2011 was extended until September

8  19, 2011 with all other pretrial motions eventually extended and due by November 4, 2011.  (See

9  Dkt. Nos 47 & 50.)  Plaintiff admits receipt of defendants' responses to his discovery requests on

10 September 22 or 23, 2011.  (See Dkt. No. 59 at p. 2.)  Accordingly, plaintiff's motion to compel

11 was filed over three months after the discovery deadline (and over three months after he received

12 defendants' responses to his discovery requests) and almost two months after dispositive motions

13 were due.  Plaintiff does not explain his inability to file the motion to compel within the

14 applicable discovery deadline or even before dispositive motions were due.  Accordingly, the

15 motion to compel is untimely and will be denied.

16         Additionally, even if not untimely, the motion to compel would be denied as

17 plaintiff's motion to compel suffers from procedural defects.  Plaintiff alludes to various

18 objections made by the defendants in their responses to his discovery requests but he does not

19 attach a copy of defendants' responses to his motion to compel.  Furthermore, his objections in

20 his motion to compel are general and overarching.  It is impossible to decipher exactly which

21 discovery requests the court should compel defendants to answer.  While recognizing that

22 plaintiff is proceeding *pro se*, "the moving party must bear the burden of informing the Court of

23 which discovery requests are the subject of the motion to compel, which of the responses are

24 disputed, why the responses are deficient, why the objections are not justified, and why the

25 information sought is relevant to the prosecution of this case."  Robinson v. Adams, Civ. No. 08-

26 1380, 2010 WL 1948252, at *2 (E.D. Cal. May 11, 2010) (citing Hallett v. Morgan, 296 F.3d

1    732, 751 (9th Cir. 2002) (moving party bears the burden of showing that denial of discovery

2    results in actual and substantial prejudice)) (other citations omitted).  Plaintiff's motion to

3    compel does not meet these requirements and will be denied.

4           Plaintiff's motion to stay the motion for summary judgment under Federal Rule of

5    Civil Procedure 56(d) argues that there are facts that are unavailable to him as stated in the

6    motion to compel.  (See Dkt. No. 60 at p. 2.)  Federal Rule of Civil Procedure 56(d) provides

7    that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot

8    present facts essential to justify its opposition, the court may:  (1) defer considering the motion or

9    deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any

10   other appropriate order."

11          Courts "have wide latitude in controlling discovery, and their rulings will not be

12   overturned in the absence of a clear abuse of discretion."  Cal. Ex. rel. Cal. Dep't of Toxic

13   Substances Control v. Campbell, 138 F.3d 772, 779 (9th Cir. 1998).  In reviewing the motion, the

14   moving party must show:  "(1) it has set forth in affidavit form the specific facts it hopes to elicit

15   from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to

16   oppose summary judgment."  Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.,

17   525 F.3d 825, 827 (9th Cir. 2008).  "Failure to comply with these requirements is a proper

18   ground for denying discovery and proceeding to summary judgment."  Id. (internal quotation

19   marks and citations omitted).  As granting the motion to stay the motion for summary judgment

20   would amount to reopening discovery, the court should also examine whether the "movant

21   diligently pursued its previous discovery opportunities and if the movant can show how allowing

22   additional discovery would have precluded summary judgment."  Panatronic USA v. AT & T

23   Corp., 287 F.3d 840, 846 (9th Cir. 2002).  In this case, as outlined above, plaintiff did not

24   diligently pursue his previous discovery opportunities.  The motion to compel which forms the

25   basis of plaintiff's Rule 56(d) motion was filed over three months after the close of discovery and

26   almost two months after defendants filed their dispositive motion.  Accordingly, plaintiff did not

4

1  diligently pursue previous discovery opportunities.  Therefore, the motion to stay the motion for

2  summary judgment will be denied.

3                        II.  SUMMARY JUDGMENT STANDARD

4          Summary judgment is appropriate when it is demonstrated that there exists "no

5  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

6  matter of law."  FED. R. CIV. P. 56(c).

7              Under summary judgment practice, the moving party
               always bears the initial responsibility of informing the district court
8              of the basis for its motion, and identifying those portions of "the
               pleadings, depositions, answers to interrogatories, and admissions
9              on file, together with the affidavits, if any," which it believes
               demonstrate the absence of a genuine issue of material fact.

10

11  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting FED. R. CIV. P. 56(c)).  "[W]here the

12  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

13  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

14  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

15  after adequate time for discovery and upon motion, against a party who fails to make a showing

16  sufficient to establish the existence of an element essential to that party's case, and on which that

17  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

18  concerning an essential element of the nonmoving party's case necessarily renders all other facts

19  immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as

20  whatever is before the district court demonstrates that the standard for entry of summary

21  judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

22          If the moving party meets its initial responsibility, the burden then shifts to the

23  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

24  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

25  establish the existence of this factual dispute, the opposing party may not rely upon the

26  allegations or denials of its pleadings but is required to tender evidence of specific facts in the

                                          5

1  form of affidavits, and/or admissible discovery material, in support of its contention that the

2  dispute exists.  See FED. R. CIV. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party

3  must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

4  of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

5  (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

6  1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

7  return a verdict for the nonmoving party.  See Wool v. Tandem Computers, Inc., 818 F.2d 1433,

8  1436 (9th Cir. 1987).

9          In the endeavor to establish the existence of a factual dispute, the opposing party

10  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

11  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

12  versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

13  judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

14  genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting FED. R. CIV. P. 56(e) advisory

15  committee's note on 1963 amendments).

16          In resolving the summary judgment motion, the court examines the pleadings,

17  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

18  any.  FED. R. CIV. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

19  477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

20  court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

21  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

22  produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

23  Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

24  1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

25  show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

26  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

6

1   'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

2                              III.  BACKGROUND

3          On September 17, 2008, plaintiff protested a bed movement because of poor

4   living conditions and poor treatment of inmates.  (<u>See</u> Defs.' Undisputed Facts ("DUF") ¶ 1.)  At

5   approximately 4:30 p.m. that day, defendant Sergeant Hayes learned that plaintiff had covered up

6   his cell windows and was refusing to relinquish his food tray.  (<u>See id.</u> ¶ 2.)  Sergeant Haynes

7   went to plaintiff's cell and ordered plaintiff to remove the window coverings.  (<u>Id.</u> ¶ 3.)  Plaintiff

8   removed the window coverings.  (<u>See id.</u> at ¶ 4.)  Sergeant Haynes then opened the security port

9   on the cell door and ordered plaintiff to hand him the food tray.  (<u>See id.</u> at ¶ 5.)  Plaintiff handed

10  Sergeant Hayes the food tray and informed Sergeant Hayes that he wanted a cell move.  (<u>See id.</u>

11  at ¶ 6.)  Subsequently, later that day plaintiff began recovering his windows.  (<u>See id.</u> at ¶ 9.)  A

12  security threat is created when an inmate covers up his cell windows because correctional

13  officers are unable to monitor the inmate's activities and the inmate could be attempting to

14  escape, to harm himself, manufacture a weapon, or attack correctional staff or other inmates.

15  (<u>See</u> Sisson Decl. ¶ 4.)

16          At that point, Sergeant Haynes informed his supervisor, Lieutenant Sisson, of the

17  situation and Lieutenant Sisson instructed Sergeant Haynes to assemble a cell extraction team

18  and get authorization for the use of pepper spray.  (<u>See</u> Haynes Decl. ¶ 6; Sisson Decl. § 5.)  The

19  use of pepper spray against plaintiff was then medically cleared.  (<u>See</u> Haynes Decl. ¶ 8.)  Prison

20  staff then prepared for the cell extraction while at the same time allowing plaintiff a "cool down

21  period."  (<u>See</u> Haynes Decl. ¶ 10; Sisson Decl. ¶ 6.)

22          At 7:15 p.m. the extraction team approached plaintiff's cell and Lieutenant Sisson

23  instructed plaintiff to be handcuffed or else he would be physically removed from the cell which

24  could include the use of pepper spray and a 40 mm launcher.  (<u>See</u> Decl. Wheeler Ex. A

25  ("Extraction Video") at 3:45.)  Sergeant Haynes then ordered plaintiff to come to his door to

26  remove his window coverings and be handcuffed which plaintiff failed to do.  (<u>See</u> Hayes Decl. ¶

                                        7

1  13; Sisson Decl. ¶ 10.)

2     After plaintiff did not comply with the order, Sergeant Haynes administered

3  pepper spray into plaintiff's cell via the security port.  (See Hayes Decl. ¶ 13; Sisson ¶ 10.)

4  Sergeant Hayes then closed the security port and instructed plaintiff to remove the coverings to

5  his cell windows and be handcuffed.  (See id.)  Plaintiff again did not comply with these orders.

6  (See id.)  Subsequently, a second batch of pepper spray was administered into plaintiff's cell via

7  the security port.  (See id.; Hayes Decl. ¶ 13.)

8     After this second use of pepper spray, plaintiff was again instructed to remove the

9  window coverings and be restrained.  (See Extraction Video at 7:37.)  Thereafter, it was

10  determined by Sergeant Haynes that a barricade of blankets was set up in plaintiff's cell.  (Hayes

11  Decl. ¶ 13.)  Lieutenant Sisson then authorized Sergeant Hayes to use the 40 mm grenade

12  launcher, a less than lethal weapon, which was loaded with a wooden baton round, to remove the

13  barrier.  (See Hayes Decl. ¶ 14-15; Sisson Decl. ¶ 14.)

14     Under CDCR policy, two approved options exist for removing a barricade inside

15  of a cell during a cell extraction:  the 40 mm launcher or the barricade removal device.  The

16  decision of which to use must be based on the safest manner to remove the barricade.  A 40 mm

17  is ineffective against a barricade fashioned from a mattress while a barricade removal device has

18  minimal success for barricades of blankets and sheets due to the fabric stretching and tearing.

19  Additionally, the barricade removal device is limited due to angles whereas the 40 mm is more

20  suited to remove barricades of blankets and sheets because it can be aimed to dislodge the

21  barricade.  (See Wright Decl. ¶ 11; Sisson Decl. ¶12.)

22     Sergeant Hayes fired the 40 mm launcher through the security port into plaintiff's

23  cell.  (See Hayes Decl. ¶ 15; Sisson Decl. ¶ 14.)  Sergeant Hayes then gave plaintiff another order

24  to come to the front of his cell and remove his window coverings.  (See id.)  After non-

25  compliance with Sergeant Hayes' order to remove the window coverings, a third round of pepper

26  spray was administered into plaintiff's cell through the security port.  (See Hayes Decl. ¶ 16;

1   Sisson Decl. ¶15.)  Sergeant Hayes then gave plaintiff additional orders to remove the window

2   coverings and agree to be restrained.  (See Hayes Decl. ¶ 17.)  Plaintiff then called for help and

3   eventually removed his window coverings and agreed to be handcuffed through the security port.

4   (See Hayes Decl. ¶ 17; Sisson Decl. ¶ 15-16.)

5          After being decontaminated from the pepper spray with water, plaintiff was

6   medically examined and the following injuries were documented:  a cut/laceration/slash on the

7   left elbow with active bleeding; a reddened area at the left shoulder; a reddened and swollen area

8   at the back of the left side of the neck and contamination of plaintiff's body with pepper spray.

9   (See Sisson Decl. ¶ 18.)  Subsequently, after plaintiff was placed back in a holding cell, a

10  subsequent evaluation determined that plaintiff had a head wound that could require additional

11  care and plaintiff was transferred to the Correctional Treatment Center for further treatment.

12  (See id.).  The wound was a minor scalp contusion.  (See Barnett Decl. ¶ 6.)

13                              IV. DISCUSSION

14      A.  Legal Standard

15          Plaintiff alleges that the defendants utilized excessive force during the cell

16  extraction in violation of the Eighth Amendment's protection against cruel and unusual

17  punishment.  (See Complaint at p. 6.)

18          The Eighth Amendment prohibits cruel and unusual punishment.  "[T]he

19  unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden

20  by the Eighth Amendment."  Whitely v. Albers, 475 U.S. 312, 319 (1986).  "The Eighth

21  Amendment's prohibition of cruel and unusual punishments necessarily excludes from

22  constitutional recognition de minimis uses of physical force, provided that the use of force is not

23  of a sort repugnant to the conscience of mankind."  Wilkins v. Gaddy, – U.S. –, 130 S.Ct. 1175,

24  1178 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 9, (1992)) (internal quotations omitted).

25          Not "every malevolent touch by a prison guard gives rise to a federal cause of

26  action."  Hudson, 503 U.S. at 9.  As the Supreme Court explained in Wilkins:

                                       9

The 'core judicial inquiry' . . . [is] not whether a certain quantum of injury was sustained, but rather 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' . . . This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. '[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation.' The extent of injury may also provide some indication of the amount of force applied.

. . .

Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts. An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury. Accordingly, the Court concluded in Hudson that the supposedly 'minor' nature of the injuries 'provide[d] no basis for dismissal of [Hudson's] § 1983 claim' because 'the blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not de minimis for Eighth Amendment purposes.' 503 U.S. at 10.

130 S.Ct. at 1178-1179 (some internal citations omitted).  In determining whether force was excessive, the court considers the following factors:  (1) the need for application of force; (2) the extent of the injuries; (3) the relationship between the need for force and the amount of force used; (4) the nature of the threat reasonably perceived by prison officers; and (5) efforts made to temper the severity of a forceful response.  See Hudson, 503 U.S. at 7.  Because the use of force relates to the prisoner's legitimate penological interest in maintaining security and order, the court must be deferential to the conduct of prison officials.  See Whitley, 475 U.S. at 321-22.

    B.  Analysis

        Plaintiff does not dispute that he refused to tear down his window coverings and be handcuffed.  Plaintiff was then warned that failure to comply with orders to tear down the wall coverings and be handcuffed could be met with pepper spray and a 40 mm launcher.  After failing to comply with these orders, pepper spray was infused into plaintiff's cell two times.  After each infusion, plaintiff was ordered to tear down his window coverings and he did not comply.

1          In his opposition to defendants' motion for summary judgment, plaintiff takes

2    issue with both the use of pepper spray and the 40 mm launcher during the cell extraction.  (See

3    Dkt. No. 57 at p. 6.)  The use of both implements are considered in turn.

4          First, the use of pepper spray was not excessive so as to constitute an Eighth

5    Amendment violation.  Applying the five Hudson factors, defendants' use of pepper spray was an

6    amount of force necessary under the circumstances.  Defendants needed to ensure the safety of

7    the inmates and staff which created a need to have plaintiff take down his window coverings.

8    When plaintiff failed to comply with orders to tear down his window coverings, this created the

9    need for the application of force.  Furthermore, prison officials are accorded "wide-ranging

10   deference" when prescribing "prophylactic or preventative measures intended to reduce the

11   incidence of . . . breaches of prison discipline."  Whitley, 475 U.S. at 322.  The use of pepper

12   spray was reasonably related to the need to extract plaintiff from his cell.  Additionally, the

13   severity of the response of using pepper spray was tempered by the repeated requests to tear

14   down the window coverings as well as the use of water after the cell extraction to lessen the

15   effects of the pepper spray once the cell extraction was complete.   Accordingly, while plaintiff

16   did show some injuries in the form of a cut on his elbow and bruising on his shoulder and neck

17   after he was extracted from the cell, he fails to show that there is a material issue of fact that the

18   use of pepper spray was used by the defendants "maliciously and sadistically for the very purpose

19   of causing harm" in light of the other applicable Hudson factors, plaintiff's injuries

20   notwithstanding.  See Hudson, 503 U.S. at 6.

21         Plaintiff also argues that the use of the 40 mm launcher constituted excessive

22   force in violation of the Eighth Amendment's protection against cruel and unusual punishment.

23   First, plaintiff disputes defendants' assertion that there was a barricade in his cell  (See Dkt. No.

24   57 Ex. D at ¶ 17.)  As stated supra, the barricade was the stated reason by the defendants why the

25   use of the 40 mm launcher was necessary.  Contrary to plaintiff's assertions, however, the cell

26   extraction video shows that there was indeed a barricade within plaintiff's cell at the time of the

11

1   cell extraction.  (See Cell Extraction Video at 9:10.)  Accordingly, this is not a disputed issue of

2   fact, plaintiff's assertions notwithstanding.

3           Besides disputing that there was a barricade in his cell, plaintiff also argues that

4   the use of the 40 mm launcher was excessive nonetheless.  Defendants assert that Sergeant

5   Haynes aimed towards the top of plaintiff's cell so as to knock down the barricade that had been

6   erected.  (See Haynes Decl. ¶ 15; Sisson Decl. ¶ 14.)  Plaintiff asserts that:

7           Defendant R. Haynes had several hours at the shooting range, and
            if this defendant was instructed by his superiors to aim at the
8           highest point of the barricade, with shooting practice, and a target
            of less than 12 feet, this shows defendant most definitely aimed
9           directly at the plaintiff, because if a barricade was fashioned to the
            ceiling, even with the plaintiff standing on the lower bunk, there is
10          still 1 foot to the ceiling.

11  (Dkt. No. 57 at p. 8.)  Furthermore, plaintiff states that he "was knocked out by the impact of the

12  wooden baton round fired from the 40 mm grenade launcher, used by defendant R. Haynes,

13  under orders from his superiors."  (Dkt. No. 57 Ex. D ¶ 8.)

14          The court must accept plaintiff's allegations as true at this stage of the litigation

15  that he was hit in the head with the wooden baton round fired from the 40 mm launcher.  The

16  question then is whether the use of the 40 mm launcher during the cell extraction was excessive

17  force in that it was used maliciously and sadistically for the very purpose of causing harm.  See

18  Hudson, 503 U.S. at 7.

19          The five Hudson factors once again need to be analyzed.  With respect to the first

20  factor – the need for the application of force – this factor weighs in favor of defendants.

21  Defendants needed to use some type of force to disassemble the barricade that had been erected

22  in plaintiff's cell after other attempts to persuade plaintiff to remove his wall coverings proved

23  ineffective.

24          The second Hudson factor requires analyzing the extent of the injury suffered by

25  the inmate.  The court must accept as true at this stage of the litigation that plaintiff was knocked

26  \\\\\

out by the impact of the 40 mm grenade launcher and that he suffered a minor scalp contusion.[1]

The third factor requires the court to analyze the relationship between the need for force and the amount of force used.  Plaintiff had erected a barricade in his cell which needed to be removed.  The 40 mm launcher was seen as the best method by the defendants to accomplish this goal.  The barricade removal device was seen as being less effective in light of its lack of effectiveness against sheet barricades.

The fourth factor analyzes the threat posed.  The defendants had a real threat posed by plaintiff.  As previously described, covering cell windows created a threat to plaintiff and prison staff as it made it impossible to view plaintiff's actions within his cell.

The fifth factor analyzes efforts made to temper the severity of the forceful response.  As previously described, the defendants made several attempts to temper the forceful response of the 40 mm launcher.  Before the cell extraction began, plaintiff was warned that the 40 mm launcher could be used during the course of the cell extraction if he did not comply. Defendants then used pepper spray in an attempt to extricate plaintiff from his cell and repeatedly gave plaintiff warnings to comply with their orders to take down his window coverings.  It was only after plaintiff's repeated refusals to comply with direct orders along with a finding that a barricade had been erected in plaintiff's cell that a decision was made to use the 40 mm launcher.

Upon analyzing the Hudson factors, while it is assumed for purposes of analyzing this motion for summary judgment that petitioner was indeed hit by the wooden baton round fired from the 40 mm launcher, was knocked out for a brief period and suffered a minor scalp contusion as a result, the remaining four Hudson factors weigh heavily in favor of defendants. Accordingly, the court finds no material issues of fact that the use of the 40 mm launcher was maliciously and sadistically used for the purpose of causing harm.  Accordingly, no material issues of fact are present with respect to plaintiff's argument that the use of the 40 mm launcher

---

[1] Plaintiff does not come forward with medical evidence to dispute that the head injury he suffered was a minor scalp contusion.

1  was excessive.

2       For all of these reasons, defendants' motion for summary judgment should be

3  granted.[2]

4  V.  CONCLUSION

5       Accordingly, IT IS HEREBY ORDERED that:

6       1.    Plaintiff's motion to compel (Dkt. No. 59) is DENIED; and

7       2.    Plaintiff's motion to stay the motion for summary judgment (Dkt. No. 60)

8           is DENIED.

9       Furthermore, IT IS HEREBY RECOMMENDED that defendants' motion for

10  summary judgment (Dkt. No. 51) be GRANTED.

11       These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

13  days after being served with these findings and recommendations, any party may file written

14  objections with the court and serve a copy on all parties.  Such a document should be captioned

15  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16  shall be served and filed within seven days after service of the objections.  The parties are

17  advised that failure to file objections within the specified time may waive the right to appeal the

18  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

19   Dated: August 14, 2012

20                      _Carolyn K. Delaney_

21                      CAROLYN K. DELANEY
                       UNITED STATES MAGISTRATE JUDGE

22

23  7
   cott0824.57

24

25  _____

26      [2] In light of the reasoning of these findings and recommendations, it is unnecessary to analyze defendants' alternative argument that they are entitled to qualified immunity.

14